**IN THE COURT OF APPEALS OF IOWA**

No. 22-0301
Filed April 27, 2022

**IN THE INTEREST OF L.M.,**
**Minor Child,**

**S.M., Father,**
    Appellant,

**A.T., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Wapello County, William Owens,
Associate Juvenile Judge.

A mother and father separately appeal the termination of their parental
rights. **MOTHER'S APPEAL AFFIRMED; FATHER'S APPEAL REVERSED AND
REMANDED.**

Jonathan Willier, Centerville, for appellant father.

Julie De Vries of De Vries Law Office, PLC, Centerville, for appellant
mother.

Thomas J. Miller, Attorney General, and Mary A Triick, Assistant Attorney
General, for appellee State.

Sam K. Erhardt, Ottumwa, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

Parents, April and Stephen, appeal the termination of their legal relationship with one-year-old L.M. Both parents contest the grounds for termination and question whether the Iowa Department of Human Services (DHS) made reasonable efforts toward reunification. April also argues termination of her rights was not in L.M.'s best interests. In the alternative, each parent argues for permissive exceptions to termination and seeks a six-month continued placement for L.M.

After reviewing the record, we reach different outcomes for each parent.[1] We affirm termination of April's rights because her unaddressed addiction prevents her from safely parenting L.M. But given Stephen's success with services and visitation while in prison, we find an extension is warranted in his case. So we reverse and remand as to him.

## I. Facts and Prior Proceedings

In July 2020, April tested positive for MDMA (ecstasy) and methamphetamine just before delivering L.M. The newborn's umbilical cord blood tested positive for methamphetamine, amphetamines, and THC. At the hospital, April identified Stephen as L.M.'s biological father.[2] But April told the DHS that they did not have an ongoing romantic relationship. Stephen tried to visit the hospital, but he was turned away. Meanwhile, April agreed to a voluntary case

---

[1] Termination reviews are de novo. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018). We give weight to the juvenile court's fact findings, but they do not bind us. *Id.*

[2] Stephen's status as L.M.'s biological father was later confirmed by paternity testing. But at the time of L.M.'s birth, April was married to Jason. So Jason is L.M.'s legal father. Jason is not a party to this appeal.

plan proposed by the DHS. That plan included family centered services (FCS) and substance-abuse evaluation and treatment. As part of safety planning, April and L.M. moved in with April's aunt and uncle. In September, April, together with L.M., was admitted into Hope House, an addiction treatment center. But she stayed for only five days before returning to her aunt's home.

As for Stephen, about two weeks after his son's birth, he met with DHS workers. He said he wanted to see L.M., but that he was "letting April do her thing" and did not "want to add something else to an already full plate."[3] Stephen later told the juvenile court that he regretted making that statement and should have handled things differently.

By October 2020, the State petitioned to have L.M. adjudicated as a child in need of assistance (CINA). After several continuances, the juvenile court granted the State's petition in March 2021 and removed L.M. from parental care, assigning legal custody of the child to the DHS. The DHS continued the placement of L.M. with his great aunt and uncle.

After L.M.'s removal, April charted inconsistent progress. Although she showed initial interest in treatment, she lacked follow-through. The few times she *did* start treatment, she stopped attending or was asked to leave before completing the programs. True, April achieved short bursts of sobriety. But month in and month out, April tested positive for illicit substances, self-reported using, or appeared to be under the influence during visits with L.M.

---

[3] At the time, Stephen was involved in a child-welfare case for his daughter, J.W., with a different mother. That case ended with the termination of Stephen's parental rights. The termination order in J.W.'s case, offered into evidence by the State, emphasized Stephen's failure to participate in services or visitation.

Likewise, April had mixed success with visitation. Early in the CINA proceedings, she attended visits supervised by FCS or by her aunt. But during an October 2020 visit at the aunt's home, April "became upset and began punching herself in the head." Concerned, the aunt called the police. Eventually, April admitted that she had relapsed. After that incident, April's relationship with the aunt soured. That souring led April to visit L.M. less often. April also backed away from FCS-supervised visits, claiming they took too much of an emotional toll on her. And, as termination neared, she stopped attending altogether.

As for Stephen, despite his full-plate comment, he had supervised visits with L.M. from September 2020 until March 2021, when he started his prison sentence for drug possession and criminal mischief. His commission of those offenses predated L.M.'s birth. And according to the record, Stephen had the chance to receive a deferred judgment or suspended sentence, but opted instead for prison.

Despite incarceration's logistical challenges, Stephen remained part of L.M.'s life. While in prison, Stephen has had weekly visits with his son—once per month in-person and the rest by videoconference. The aunt has facilitated those visits.[4] While the FCS worker did not oversee those interactions, the case manager testified that the DHS had "no reported concerns." April also testified that her aunt was supportive of Stephen's relationship with L.M. Beyond visitation, Stephen has profited from support groups and parenting classes while in prison.

---

[4] The DHS case manager explained: "[T]he provider has not been providing those because we have limits on what can be provided per the contract now for families."

The parole board was expected to consider his release in May 2022.[5]  After parole, he expected to live with his sister, though a halfway house remained a possibility.

Concerned by April's stalled progress and Stephen's uncertain future, in October 2021, the State petitioned to terminate their parental rights.  After a January 2022 hearing, the juvenile court granted the petition.  They both appeal.

## II.  Analysis

Our review follows a three-step process.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  First we look for a termination ground.  Iowa Code § 232.116(1) (2021).  Then we consider the child's best interests.  *Id.* § 232.116(2).  And finally, we examine factors weighing against termination.  *Id.* § 232.116(3).  Because each parent challenges different steps, we discuss their appeals separately.

### A.  April's Appeal

#### 1.    Grounds for Termination

The juvenile court terminated April's rights under Iowa Code section 232.116(1), paragraphs (g) and (h).  April contests both paragraphs.  We focus on paragraph (h).  *See In re S.R.*, 600 N.W.2d 63, 64 (Iowa 1999) ("[W]e need only find grounds to terminate under one of the sections cited by the juvenile court.").  Under that paragraph, a juvenile court may terminate parental rights if:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months,

---

[5] The parole board denied his release in November 2021, and according to the State, he was eligible to apply again in six months.

or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h).

April only challenges the final element. She argues the State did not offer clear and convincing evidence that L.M. couldn't be returned to her custody. Countering, the State points to April's inability to address her addiction. Clear and convincing evidence should leave us with "no serious or substantial doubts as to the correctness or conclusions of law drawn." *D.W.*, 791 N.W.2d at 706 (citations omitted). After our de novo review, we find clear and convincing evidence supports the termination of April's rights.[6]

That evidence starts with April's drug use during her pregnancy, which prompted the CINA adjudication. And, nearly two years later, her substance abuse remains unaddressed. The DHS offered treatment services, ranging from out-patient to residential options. But April did not succeed. In September 2020, she was admitted to Hope House with L.M., staying less than one week. Come

---

[6] Our case law offers two formulations for what it means that a child "cannot be returned" to parental custody as provided in section 232.102 (discussing transfer of a child's legal custody if staying in the home would be "contrary to the welfare of the child"). Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992) which quotes section 232.102(4)(a)(2) (2021)—then numbered section 232.102(5)(b)— for the proposition that custody should be transferred only if the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available." *See, e.g.*, *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016). But more recent cases observe that our supreme court often describes that element simply as the inability to "safely return" children to their parents' care. *See, e.g., In re T.W.*, No. 20-145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases). Under either articulation, we find the State met its burden of proof.

December 2020, she tried again. But just two weeks passed before she was "asked to leave by staff." And the next year spelled more of the same. Indeed, during the termination hearing, the case manager testified that April hadn't "engaged in any sort of substance abuse treatment in the last sixty days." Without treatment, her substance abuse continued unabated. In November 2021—just a few weeks before the termination hearing and over a year into the proceedings— April reported "using nearly daily."

As for mental-health treatment, April registered for Eye Movement Desensitization and Reprocessing therapy with several providers. But when these providers tried to schedule an appointment, April never responded. All-in-all, April only attended a handful of sessions during the life of these proceedings.

Most troubling, April stopped seeing L.M. At first, she regularly attended visitations at the Four Oaks agency and at her aunt's home. But with time April's visits tapered off. And, leading up to termination, April went ninety days with no contact with L.M.[7] From this record, we find clear and convincing evidence supporting termination.

Pivoting slightly, April argues that the DHS failed to make reasonable efforts toward reunification.[8] The DHS must provide "every reasonable effort to return the

---

[7] April tried to explain her absences. On the relative-placement side, she did not feel welcome after her October 2020 relapse. As for Four Oaks, the visits were too emotionally taxing. L.M. would cry as each visit ended; seeing her upset son affected April. So, because it was "easier for [her]," she stayed away. April did have "at least two interactions" with L.M. in January 2022.

[8] In her petition on appeal, April uses this heading: "Reasonable Efforts to Reunify Were Not Provided When the Termination Petition Was Filed Prior to the Permanency Review Hearing." Like the State, we understand that argument to be a request to delay permanency, which we will address separately.

child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7). The State must show it has made reasonable efforts to reunite the family as a part of its ultimate proof the child cannot be safely returned to the parent's care. *In re L.T.*, 924 N.W.2d 521, 527 (Iowa 2019). That said, parents must voice timely objections if they view the offered services as inadequate. *In re A.N.*, No. 02-1985, 2003 WL 291627, at *3 (Iowa Ct. App. Feb. 12, 2003).

To support her reasonable-efforts argument, April points to the decreased number of visits offered after the State petitioned for termination. But even before that change, April's attendance had waned. So it's unclear how more chances to interact would have helped reunification. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa 2000) (noting that parents are only entitled to services that are "reasonable under the circumstances"). The visitation offered by DHS was reasonable.

### 2. Best Interests

April next challenges the juvenile court's best-interests findings.[9] Statutory factors guide that analysis. *See, e.g.*, *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). We give primary consideration to L.M.'s safety, to the best placement for furthering his long-term nurturing and growth, and to his physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). With these principles in mind, we believe termination of L.M.'s legal relationship with April is in his best interests. From her pregnancy to the present, April's drug use has endangered L.M. Her

---

[9] The State argues "the exact parameters of what legal issues were raised below by the parents are not clear," so error was not preserved. But after reviewing the record, we disagree and proceed to the merits.

addiction would continue to pose a risk to his safety if the parental bond were preserved. *See In re J.P.*, No.19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) ("[M]ethamphetamine use, in itself, creates a dangerous environment for children."). Outside of parental care, L.M.'s needs are being met at his great aunt's home. *See* Iowa Code § 232.116(2)(b) (considering integration into foster family). We affirm the juvenile court on this second step of the termination process.

### 3. Factors Weighing Against Termination

April next claims the court should have decided against termination because L.M. "resides with maternal relatives." *See* Iowa Code § 232.116(3)(a) (allowing court to forgo termination if "a relative has legal custody of a child"). She also argues her bond with L.M. should have precluded termination. *See id.* § 232.116(3)(c) (allowing court to preserve parent's rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). Proving these exceptions was April's burden. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). Because these exceptions are permissive, not mandatory, juvenile courts have considerable discretion in their application. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

April's evidence falls short. For paragraph (a), the record does not show L.M. was in his great aunt's "legal custody." *See id.* But even if he were in relative custody, the friction between April and her aunt weighs against this exception. As for paragraph (c), April's unaddressed addiction outweighs any detriment to L.M. caused by terminating April's rights. *See D.W.*, 791 N.W.2d at 709. True, L.M. cries when visitations end, and the FCS provider acknowledged a "strong bond"

between mother and son. But according to the same provider, such tears are a common reaction for children his age. And April likely diminished that bond by avoiding visitation for nearly three months. Bottom line, L.M. has spent two-thirds of his eighteen-month-long life out of his mother's care. *See In re A.H.*, No. 17-1717, 2017 WL 6513633, at *2 (Iowa Ct. App. Dec. 20, 2017) (rejecting close-bond exception when children spent more than half their lives removed from parents.). Under these facts, we decline to apply either of these section 232.116(3) exceptions.

### 4. Continued Placement

Finally, April asks for six more months to become a safe parent. The juvenile court may delay permanency if it can "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). But considering April's inability to address her addiction, a delay was unwarranted. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (noting "the parent's past performance" predicts "the quality of future care"). After eighteen months, April still struggles with substance abuse and mental health. She concedes on appeal that her progress was "minimal." Given her record, like the juvenile court, we have little confidence that she could be a stable caregiver in six months.

**B. Stephen's Appeal**

**1. Grounds for Termination**

As in April's case, the juvenile court terminated Stephen's rights under Iowa Code section 232.116(1), paragraphs (g) and (h). But, unlike April, Stephen only challenges paragraph (g). Because he "concedes the statutory grounds under [paragraph (h)] were met," we adopt the juvenile court's decision on that ground. *See S.R.*, 600 N.W.2d at 64 (noting we may affirm on any ground cited by juvenile court).

Next, Stephen challenges reasonable efforts. But Stephen does not complain about the quality of services he received. To quote his petition on appeal: "Here, the father is not arguing that the services he was offered were inadequate. In fact, the services required of him were adequate and he completed all of them successfully." Instead, he insists the duration of the services was too short, depriving him of time to regain custody. Because this argument sounds more like a request for continued placement than a complaint about reasonable efforts, we consider it under a separate heading.

**2. Factors Weighing Against Termination**

Like April, Stephen asserts that termination was unnecessary because L.M. is "in a stable placement with relatives."[10] *See* Iowa Code § 232.116(3)(a). As noted above, placement with relatives and "legal custody" are two different things.

---

[10] Stephen also suggests that we consider paragraph (e) of section 232.116(3). That provision allows a court to forgo termination if the parent's absence is caused by "commitment to any institution, hospital, or health facility." Iowa Code § 232.116(3)(e). But we have long held that the legislature did not mean penal institutions. *In re J.S.*, 470 N.W.2d 48, 51 (Iowa Ct. App. 1991). So that exception does not apply here.

Here, "DHS has legal custody." *In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021). Although this exception is not in play, we find placement with the great aunt is relevant to Stephen's request for six more months to become a safe caregiver. We address that request in the next section.

### 3.      Continued Placement

Again like April, Stephen asks for more time to work toward reunification. Unlike her case, we find merit in his request.  As noted above, to continue placement for six months, the juvenile court must determine the need for removal will no longer exist at the end of the extension.  *See* Iowa Code § 232.104(2)(b). In making that prediction, the court must consider Stephen's past performance. *See A.B.*, 815 N.W.2d at 778.

Granted, Stephen is no saint.  He's struggled with being a reliable parent in the past, as shown by the prior termination of his parental rights.  But in this case we see real potential for Stephen to fulfill his role as father.  By all accounts, Stephen has taken these proceedings to heart and has made a genuine effort to be united with his son.  In February 2021, the DHS case manager observed Stephen's interaction with then seven-month-old L.M., describing the father as attentive to the child's needs and "bonded to him."[11]  Even from behind bars, he

---

[11] According to DHS notes, Stephen often read books to L.M., took naps with him, played on the floor with him, and held him on his lap while sitting near a window because L.M. "appears to like watching what is going on outside."  And, during some visits, Stephen would video chat with his mother so L.M. could see his grandmother.

has maintained regular visits with L.M., both in-person and remote, thanks to the diligence of L.M.'s aunt. Stephen describes making the most of their time together:

> The in-person visits go well. We have limited things to do at Mount Pleasant. First, he interacts with me. I hold him. I feed him. We walk around the visiting room. And the video visits, I talk to him, watch him play. He comes to the screen and talks to me with, you know, babble and stuff. He knows a few words. He knows sign language—he knows some things in sign language, and they go pretty well for being through the video.

According to the case manager's testimony, the aunt confirmed that the interactions went well.

Visitations aside, Stephen has maximized all the, comparatively limited, resources available to him while incarcerated. He's enrolled in substance-abuse support groups like Narcotics Anonymous (NA) and Alcoholics Anonymous(AA)—even chairing the former. He's also participated in parenting programs like DHS 101, Incarcerated Fathers, and 24/7 Dads. And he's completed a behavioral therapy program called MRT.[12] And the case manager testified that if Stephen were out of prison, he wouldn't be ruled out as a placement option.

Beyond his personal growth, Stephen has proved to be a model inmate. Prison officials took notice of his good behavior. On the strength of his record, in November 2021 Stephen's counselor secured him a "positive transfer" to the Newton Correctional Facility. There, he is allowed more freedom, including the

---

[12] MRT or Moral Reconation Therapy is described as "a systematic, cognitive-behavioral, step-by-step treatment strategy designed to enhance self-image, promote growth of a positive, productive identity, and facilitate the development of higher stages of moral reasoning." *See* Jeremiah Bourgeois, *The Irrelevance of Reform: Maturation in the Department of Corrections*, 11 Ohio St. J. Crim. L. 149, 159 n.20 (2013) (quoting Dr. Gregory L. Little & Dr. Kenneth D. Robinson, *How To Escape Your Prison: A Moral Reconation Therapy Workbook* (2006)).

option to do "off-grounds work." Indeed, by the time of the termination hearing, Stephen had begun applying for offsite jobs.

Despite this progress, the State argues against an extension, noting that Stephen hasn't shown he can maintain sobriety outside of prison. That may be true.[13] But Stephen has shown a commitment to NA and AA. He testified that his work in those groups will help him stay clean, having had "time to practice the steps" and learn to "take things one day at a time." True, incarceration may have "forced" Stephen into sobriety. But that's no reason to discount his progress. Particularly here. Stephen could have pursued a deferred judgment or suspended sentence. But after self-reflection he *chose* incarceration because he "felt that it was a faster way to be rehabilitated." Even knowing it would prevent him from being an immediate placement option for L.M., he picked an environment that he believed would put him in the best position to succeed. Indeed, the case manager confirmed Stephen exhausted all services available to him while in prison.

Like the case manager, we acknowledge the expectations for Stephen would be "different" after his release. Although his progress under the circumstances is commendable, Stephen's efforts post-release must take on a new form. Simply put, more than sobriety and a strong parent-child bond will be needed. *See A.S.*, 906 N.W.2d at 473 (examining whether child could be "safely returned" to parental custody). So Stephen must take advantage of the additional

---

[13] Because he was incarcerated for a large portion of these proceedings, the extent of Stephen's need for substance-abuse treatment isn't as clear as April's. On the one hand, in the termination order for J.W.'s case, the juvenile court found "no evidence Stephen has a substance abuse problem." On the other hand, Stephen self-reported using in the past.

services the DHS offers him upon release.[14]  That said, Stephen appears up to the task, having independently looked into treatment programs available "on the streets" before the termination hearing.  On balance, we find his behavioral changes place him on a strong footing for reunification post-release.[15]

Moving from sobriety, the State stresses the uncertainty of Stephen's release date.  The record shows he will be considered for parole in May and possibly released in June 2023.[16]  Given his "positive move" from Mt. Pleasant to Newton, the likelihood of that spring release is high.  Yet even if that date is correct, we understand that a portion of a six-month extension would still find Stephen in prison, limiting his ability to showcase his parenting skills in the community. Admittedly, the timing is not ideal.

But despite that time crunch, we find the juvenile court should have given Stephen more time to show he could safely parent L.M.  Stephen met his burden to show the impediments to placing L.M. with him would not exist in six months. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021).  Indeed, if he continues the good work he started in prison, Stephen will be drug free, employed, bonded to L.M., and practicing his parenting skills in the community.  And the continued placement serves L.M.'s best interests.[17]  *See id.*  If Stephen can fulfill his promise,

---

[14] To name a few, the record shows that before his incarceration, the DHS recommended substance-abuse evaluations, drug screenings, and mental-health evaluations.

[15] What's more, Stephen's arrangement at Newton which allows off-grounds work is, in sorts, a dry run for release.

[16] Stephen's discharge date is June 2023.

[17] As one commentator observed: "Meaningful efforts to reunify families are made, not only because fairness demands it, but because it is also in the child's best interests."  Brent Pattison, *Mama Tried: Shifting Thinking (and Practice) in*

he will be the best placement for furthering L.M.'s long-term nurturing and growth. *See* Iowa Code § 232.116(2).

We recognize similarities between this case and *In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017), in which our supreme court found termination was in a child's best interests despite the mother's "substantial progress" in prison on her "rehabilitation journey." But in *L.M.*, the mother had no bond with the toddler and the child needed immediate stability. Stephen's case is different.

His case does not present a situation in which, if the plan fails, "all extended time must be subtracted from an already shortened life for the child[] in a better home." *See In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). L.M. will stay comfortably in the home of his great aunt and uncle. When asked what impact a delay in permanency would have on L.M., the DHS case manager confirmed: "I don't think that anything would change." She testified that given L.M.'s young age, he "wouldn't be affected negatively one way or the other if the time period was extended by [a few] more months."

Given his father's promising conduct while in prison, we now find that L.M.'s placement with his great aunt should continue for six months from the date of procedendo while Stephen makes the behavioral changes necessary to resolve the need for removal. During that extension, the DHS should provide Stephen with

---

*Child Welfare Cases When A Parent Is Incarcerated*, 27 Am. U. J. Gender Soc. Pol'y & L. 495, 497 (2019).

visitation and other reasonable services to achieve reunification.

**MOTHER'S APPEAL AFFIRMED; FATHER'S APPEAL REVERSED AND REMANDED.**

Greer, J., concurs; Ahlers, J., partially dissents.

**AHLERS, Judge** (concurring in part and dissenting in part).

I concur in the decision to affirm termination of the mother's parental rights. As to the majority's decision to reverse the juvenile court's ruling terminating the father's parental rights, I dissent.

While the majority makes a spirited case for why the father should be given an additional six months to work toward reunification, two key circumstances prevent me from joining the majority opinion. The first is the father's lack of track record of parenting. The father's rights to another child were terminated. This child has never been in his care. So, this is not a situation in which the father has demonstrated an ability to parent and his prison time is just a temporary break in that ability. If the father had ever shown an ability to be a placement option for the child, speculating on his prison-release date and a quick return of the child to his care may be more palatable. However, the father has not shown that ability. Given the uncertainty whether the father even has the ability to be a viable placement option contributes to my inability to join the majority's conclusion that the father should be given additional time.

The second circumstance that prevents me from joining the majority is the relevant time horizon. Our court is reviewing this matter in April 2022. This gives us a distorted view of the situation in comparison to that of the juvenile court, which had to view the situation from the time of the termination hearing in January 2022. *See* Iowa Code §§ 232.104(2)(b) (2021) (allowing an additional six months from the time of the hearing), .117(5) (allowing orders in accordance with section 232.104 from the time of hearing). As our task is to review the juvenile court's decision, it is important to place ourselves in the juvenile court's position. That

includes assessing the father's prospects measured from January rather than April. From that vantage point, I am convinced the juvenile court got it right.

At the time of the termination hearing, the father was in prison with no possibility of release on parole until June 2022—five months into the father's requested six-month extension. Of course, it is speculative whether the father will be granted parole in June. It is also unknown where the father will go upon his release. The evidence was conflicting on whether he would be released to live at a halfway house or with his sister. Even if the father is released in June to live with his sister, the father will then need to demonstrate that he can maintain sobriety and stability on an ongoing basis and that he is capable of caring for this young child. In order to give a parent an additional six months to work toward reunification requires us to have the ability to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b). The window being assessed starts in January at the time of the termination hearing and ends in July. To reach the decision made by the majority requires assuming that (1) the father will be released from prison in June; (2) he will be released to live with his sister rather than a halfway house; and (3) within one month's time following his release from prison, he will be able to show an ability to maintain sufficient ongoing sobriety, stability, and parenting skills so the child can be safely placed in his care. These "ifs" are way too big and too numerous to allow me to conclude that the juvenile court erred in not granting the father an additional six months to work toward reunification.

I agree with the majority that the father has done a commendable job of participating in programs offered in prison. If he had a history of showing an ability to parent, had an earlier (and more definite) parole date, or both, then I would be in favor of giving him an additional six months to work toward reunification, and I suspect the juvenile court would have been too. However, as those are not our facts, I conclude the juvenile court was right not to grant the father an additional six months. As the majority concludes otherwise, I respectfully dissent from the decision to reverse the ruling terminating the father's parental rights.